**196**

In re Malcolm Henry HAVARD, Debtor.

CTHH ENTERPRISES, INC., Appellant,

v.

Ted Brett BRUNSON, Trustee,
et al., Appellees.

Civil A. No. 96–2634.

United States District Court,
W.D. Louisiana,
Alexandria Division.

April 10, 1997.

Nancy E. Knight, Alexandria, LA, for appellant.

Jean Marie Sweeney, William C. Gambel, Milling Benson Woodward Hillyer Pierson & Miller, New Orleans, LA, for appellee.

T. Brett Brunson, Luster Connie, et al., Natchitoches, LA, for Chapter 7 Trustee.

*DECISION ON APPEAL*

F.A. LITTLE, Jr., Chief Judge.

The bankruptcy court, in an order filed 22 August 1996, denied a motion for turnover made by CTHH Enterprises, Inc. ("CTHH"). CTHH then filed a timely notice of appeal to this court. We AFFIRM the decision of the bankruptcy court, but for different reasons. The basis of our decision follows.

## I. BACKGROUND

CTHH filed a motion to turnover property in the United States Bankruptcy Court for the Western District of Louisiana, seeking an order directing the trustee, Ted Brett Brunson, to turn over Commodity Credit Corporation payments. The motion was opposed by the Farm Credit Bank of Texas ("FCBT") and the trustee. The bankruptcy court, by order dated 22 August 1996, denied the motion. CTHH subsequently perfected an appeal to this court.

The facts, as found by the bankruptcy court, may be summarized briefly. The debtor, Malcolm Henry Havard, filed for chapter 12 relief on 26 May 1995. The case was converted to a chapter 7 proceeding on 14 November 1995. Prior to the filing, the debtor entered into a contract with the Commodity Credit Corporation, placing his farmland into the Conservation Reserve Program ("CRP"). FCBT held a mortgage on the property enrolled in the CRP. The United States District Court for the Western District of Louisiana seized the property by writ of *fieri facias*, and, by order dated 5 September 1995, authorized FCBT to foreclose. CTHH purchased the land on 20 December 1995. In addition to the clause describing the property boundaries, both the mortgage and deed contained the following description of the rights conveyed with the land:

> together with all buildings, component parts, incorporeal immovables, immovables by declaration, and other improvements, and all batture, relictions, derelictions, strips and gores, rights, ways, privileges and appurtenances, servitudes, and hereditaments and advantages thereunder belonging or in anywise appertaining, now owned or hereafter acquired ..., together with the rents, issues, profits, revenues and income therefrom.

The parties contest whether the rights to the CRP payments, for crop and fiscal years 1995, were included in the 20 December 1995 conveyance to CTHH. Finding that no transfer occurred, the bankruptcy court denied CTHH's motion to turnover the CRP payments.

CTHH argues that the debtor mortgaged the rights to the CRP payments and that these rights were conveyed to CTHH in the later sale. CTHH contends, pursuant to Louisiana law, that the CRP payments may be characterized as "rents," that rents are civil fruits, and that the seizure and sale of the subject property included the civil fruits of the parcel. In the alternative, CTHH argues that the CRP contract rights constitute an incorporeal immovable, a lease, and that incorporeal immovables were conveyed explicitly in the sale.

FCBT and the trustee challenge CTHH's interpretation of the property description. Relying on common law rules of contract construction, they argue that the instrument conveyed only the land, real rights running with the land, rents derived from real rights, and crop allotments. Citing the federal CRP regulations, the appellees contend that the rights created under the CRP contract are neither real rights nor derivatives of real rights and, therefore, fall outside of the conveyance. In response to CTHH's alternate theory, appellees argue that, under Louisiana law, the CRP contract cannot constitute a lease because it did not convey a right of possession. Even assuming that the CRP contract is a lease, the appellees contend that the deed conveyed only those incorporeal immovables that were real rights and that a lease is not a real right.

## II. STANDARD OF REVIEW

This court has capacity to hear appeals from decisions of a bankruptcy court. See 28 U.S.C. § 158. Our review of a bankruptcy court's decision is governed by the same standards employed by a review by the Fifth Circuit. A bankruptcy court's conclusions of law are subject to *de novo* review on appeal and the findings of fact are adopted, unless

clearly erroneous. *In re Rash,* 90 F.3d 1036 (5th Cir.1996); *In re Placid Oil,* 988 F.2d 554, 557 (5th Cir.1993).

### III. ANALYSIS OF THE CRP PAYMENTS

#### A. *Choice of Law*

■ In the absence of controlling federal law, state law controls the substantive nature of the security interests at issue in a bankruptcy claim. *Matter of Haber Oil Co., Inc.,* 12 F.3d 426, 435 (5th Cir.1994) (citing *In re Oxford Management, Inc.,* 4 F.3d 1329, 1334 (5th Cir.1993); *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979)). We find that the deed conveying the debtors' land to CTHH controls the interests at issue in this bankruptcy case, and must be interpreted pursuant to Louisiana law.

At the same time, however, "federal law governs questions involving the rights of the United States arising under nationwide federal programs." *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). *See Bank of Am. Nat'l Trust and Sav. Ass'n v. Parnell,* 352 U.S. 29, 34, 77 S.Ct. 119, 122, 1 L.Ed.2d 93 (1956) ("Federal law of course governs the interpretation of the nature of the rights and obligations created by the Government bonds themselves."); *Clearfield Trust v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *Mafrige v. United States,* 893 F.Supp. 691, 700 (S.D.Tex.1995) ("the construction of a deed to which the United States is a party is a question of federal law"). Where no federal legislation or regulation answers the precise legal question, a court must analyze whether federal or state law controls the interstitial lawmaking. *Kimbell,* 440 U.S. at 727, 99 S.Ct. at 1458 ("That the statutes authorizing these federal

lending programs do not specify the appropriate rule of decision in no way limits the reach of federal law.").

■ The CRP contract is a contract between the debtor and the Commodity Credit Corporation ("CCC"), 16 U.S.C.S. § 3841 (Law.Co-op.Supp.1996), a federally chartered corporation under the supervision of the United States Department of Agriculture. 15 U.S.C.S. § 714 et seq. (Law. Co-op.1984 & Supp.1996). Since such contracts involve the federal government directly, federal law governs the classification of the federal rights created by a CRP contract. Finding that federal positive law provides sufficient guidance to resolve the issue here in dispute, we need not consider the appropriate source of law for the interstices of this field of law.[1] In sum, Louisiana law guides our understanding of the conveyance to CTHH; federal law defines the CRP contract.

#### B. *Interpretation of the act of conveyance*

■ The cardinal rule of contract interpretation requires a court to determine the intent of the parties. La. Civ.Code Ann. arts. 2045–2055 (West 1987); *Amend v. McCabe,* 664 So.2d 1183, 1187 (La.1995). When the terms of the contract are unambiguous, "no further interpretation may be made in search of the parties' intent." *Amend,* 664 So.2d at 1187; article 2046. A word is given its "generally prevailing meaning," article 2047, and a word susceptible of different meanings is interpreted so as to conform best to the purpose of the contract. Article 2048. Likewise, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." Article 2050. Any doubts should be resolved in favor of the "nature of the contract, equity, usages, the

---

1. *Kimbell,* 440 U.S. at 727–729, 99 S.Ct. at 1457–59. Fifth Circuit summarized this analysis as follows:

   When ... extensive federal legislation and regulation exist in the area but do not directly address the precise and narrow issue of litigation, the pertinent analysis assesses whether there exists a valid and substantial federal interest or policy that requires the application of federal law as an exercise of interstitial lawmaking to protect or effectuate the federal

   scheme. When no such federal interest or policy exists, *Erie* requires that state law apply. *First S. Fed'l Sav. and Loan Ass'n of Mobile, Ala. v. First S. Sav. and Loan Ass'n of Jackson Cty.,* 614 F.2d 71, 73–74 (5th Cir.1980) (citing *Miree v. DeKalb Cty.,* 433 U.S. 25, 28–29, 97 S.Ct. 2490, 2493–2494, 53 L.Ed.2d 557 (1977); *America Nat'l Trust and Sav. Ass'n v. Parnell,* 352 U.S. 29, 33–34, 77 S.Ct. 119, 121–122, 1 L.Ed.2d 93 (1956)). *See also In Matter of Omni Video, Inc.,* 60 F.3d 230, 232 (5th Cir.1995).

conduct of the parties …, and of other contracts of a like nature between the same parties." Article 2053. "Usage … is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation." Article 2055.

In the instant case, we agree with the appellees that the term "rents" cannot be interpreted alone. The clause containing that term limits the type of rents conveyed. The word "therefrom," in the phrase "together with the rents … therefrom," indicates that the deed only conveyed those rents derived from the interests described in the previous clause. We must first determine the nature of the primary interests conveyed and then determine if the CRP contract may be included among those interests. Thus, we need not reach the issue of whether the payments constitute rents unless we find that the CRP contract rights themselves were conveyed.

We recall that the main clause in dispute contains the following language:

[the land], together with all buildings, component parts, incorporeal immovables, immovables by declaration, and other improvements, and all batture, relictions, derelictions, strips and gores, rights, ways, privileges and appurtenances, servitudes, and hereditaments and advantages thereunder.

Observing that this conveyance was a marshal's sale of a debtor's land, we find that the parties generally intended to transfer the land and any rights connected to that land. Articles 2045, 2053. Indeed, each term in the clause describes an immovable or a real right that runs with the land. *See* La. Civ. Code Ann. arts. 462, 463, 465, 469, 470, 1764 (West 1980); 2 A.N. Yiannopoulous, *Louisiana Civil Law Treatise: Property* §§ 99, 134, 141, 142, 214 (2d ed.1980). Moreover, the use of the word "thereunder" provides further evidence that each thing listed is connected to the land.

■ True, a person may have a real right or a personal right in an "incorporeal immovable." Article 470; Yiannopoulous, *supra*, § 99. In light of the other terms in the contract and the general purpose of the con-

tract, articles 2048, 2050, and 2053, we find that the phrase "incorporeal immovables" intended to convey only real rights existing in incorporeal immovables. Thus, we reject appellant's argument that the deed conveyed any rights in a lease, and, therefore, need not consider whether the CRP contract constituted a lease. As the appellant points out in its brief, a lease is a personal right in which " ' [t]he parties *obligate themselves* reciprocally.' " (quoting *Ivanhoe Corp. v. Bunn*, 694 So.2d 263 (La.Ct.App.1995)) (emphasis added by the court). To ascertain whether the CRP contract created a real right in an incorporeal immovable, however, we must understand the nature of that agreement.

## C. *Classification of the CRP contract rights*

■ Though it may confer incidental benefits on farmers, the Conservation Reserve Program may be properly characterized as yet another weapon in the war to save the environment. Congress expressly enacted this program "to conserve and improve the soil and water resources of … erodible croplands[,] … marginal pasture lands converted to wetland or established as wildlife habitat[,] … marginal pasture lands to be devoted to trees in or near riparian areas[,]" and other croplands found to pose an environmental threat. 16 U.S.C.S. § 3831 (Law.Co-op. Supp.1996). To accomplish these goals, Congress enlists the aid of farmers who, in exchange for annual payments, agree to reduce cropland acreage and to implement particular conservation programs developed by the Department of Agriculture.

In support of its argument that the CRP contract rights run with the land, the appellant notes that the contract provides for "annual rental payments." *See* 16 U.S.C.S. § 3801(a)(11) (Law.Co-op.Supp.1996); 7 C.F.R. § 704.2(a)(2) (1996). Notwithstanding this phrase, the substance of the agreement clearly demonstrates that the contract rights are not in the nature of a land conveyance. Both owners and operators of qualifying lands may enter into CRP contracts. 7 C.F.R. § 704.6. The terms of such contracts are of limited duration. 16 U.S.C.S. § 3831(e). Indeed, Mr. Havard entered into

a ten year contract with the CCC. Contrary to appellant's assertion that the contract merely establishes in the government "a right over the property to have it held out of production," the federal laws and regulations create a number of personal obligations in the CRP participant. *See generally* 16 U.S.C.S. § 3832 (Law.Co-op.Supp.1996); 7 C.F.R. § 704.12. For example, a participant must implement the conservation plan specified in the contract, 7 C.F.R. § 704.12(a)(2), and maintain a designated vegetative cover intended to reduce soil erosion. 7 C.F.R. § 704.12(a)(7).

The enforcement provisions also reflect the CRP contract's personal nature. Violations of the terms and conditions of the contract may, at the option of the CCC, terminate the contract. 7 C.F.R. § 704.22(a)(1). Since the program is designed to protect soil and water resources, termination of the contract due to violations of the conservation plan gives rise to severe penalties. These penalties include that the participant must (1)forfeit all remaining payments, (2) refund, with interest, all payments previously received, and (3) pay liquidated damages. 16 U.S.C.S. § 3832(a)(5); 7 C.F.R. § 704.22(2)–(3). If a participant transfers his interest in land enrolled in the CRP, the new owner or operator may assume the rights and duties of the CRP contract *only* with the approval of the CCC. 16 U.S.C.S. § 3832(a)(6); 7 C.F.R. § 704.21(a)(1). Moreover, should the transferee of the participant's interest in the land not assume the CRP contract, the participant may be subject to the penalties for violation of the contract. 16 U.S.C.S. § 3832(a)(6); 7 C.F.R. § 704.21(b). Finally, we observe that foreclosure does not necessarily terminate a participant's responsibilities under the contract, 16 U.S.C.S. § 3832(e), nor do title disputes necessarily affect a participant's right to payment. 7 C.F.R. § 704.19.

Based on the foregoing analysis of the applicable provisions of the contract, we find that the rights created in the CRP contract do not run with the land, but attach to the person who forms the contract with the CCC.

### D. *Summary of our findings*

Given our understanding of the CRP contract, the court returns to the interpretation of the conveyance to CTHH and the issue of whether CTHH acquired any rights to CRP payments as a result of that conveyance. We found that, pursuant to Louisiana law, the deed conveyed only real rights. We further found that, pursuant to federal law, CRP contracts create rights and duties between the CCC and participants, and that the contract does not run with the land. Invoking the terminology of Louisiana law, we find that the CRP contract at issue created personal rights in Havard, not real rights in his land.[2] Thus, we determine that Havard's rights under the CRP contract were not part of the conveyance to CTHH.

### IV. CONCLUSION·

Finding that CTHH did not acquire any rights to the debtor's CRP payments, we AFFIRM the bankruptcy court's order denying CTHH's motion for turnover.

2.   A personal right may be defined as the legal power that a person (obligee) has to demand from another person (obligor) a performance consisting of giving, doing, or not doing a thing.

\*     \*     \*

The Supreme Court has declared that "the term 'real right' under the civil law is synony-mous with proprietary interest, both of which refer to a species of ownership. Ownership defines the relation of man to things and may, therefore, be declared against the world." Yiannopoulous, *supra*, § 134 (quoting *Reagan v. Murphy*, 235 La. 529, 105 So.2d 210, 214 (1958)).